Please call the case. People v. Carlos Gomez You can step forward now counsel. May it please the court, my name is Jeff Burkhardt, I'm the attorney in charge of this case.  on behalf of Carlos Gomez. Your honors, we initially raised four issues in this case. Since then we've conceded the third issue that was the one regarding Rule 431B. Among the three remaining issues I'd like to devote my time today to the first one regarding the Fourth Amendment. However, if there are any questions to answer to either of the other two issues, I'd be happy to answer those as well. It's undisputed that at 5 a.m. on Thanksgiving, four detectives entered Carlos Gomez's home. They woke him up, they told him to get dressed, and then they drove him to Area 1 where he was given Miranda warnings. Now, it's well established that police can't arrest without a warrant or probable cause, and in fact the state agrees that the police in this case had neither a warrant nor probable cause. So the only issue before this court is whether Mr. Gomez was arrested under the Fourth Amendment. Today I plan to show that he was indeed arrested, and in fact his seizure was indistinguishable from a traditional arrest. Before I get to the factors, I want to discuss a few things just briefly. First, we don't challenge the factual findings of the lower court, so the review is de novo. Well, you understand that the judge that heard the motion made credibility findings, and to the extent that you're conceding that the witnesses put forth by the state were credible and the judge found them that way, then you narrow that review of what is at stake here. That's correct, Your Honor, and we believe that even given the state's evidence in this case, that Mr. Gomez, there's no doubt that he was under arrest. And so we would rely on even the state's evidence. Wasn't the state's evidence that he was asked if he would accompany them and he said yes? That's correct, and that's just one of the factors. Is there any dispute, then, that in this particular case, a gentleman named Mr. Cortina was brought into the station after he had been treated for a head injury at a hospital within two blocks of the address where Ms. Walson was murdered? That's correct, Your Honor. And he was brought in because they wanted to find out if there was any connection between his head injury and the murder, and we had this other information that Mr. Robert Walson observed a possible offender leave his home. He gave a description to the police, and Mr. Cortina seemed to fit that description. That's correct. So at the time that the police went to Mr. Gomez's home, you're basically saying it's undisputed, then, that the police went to talk to Mr. Gomez, not to arrest him, not as a suspect, but as a possible alibi witness to confirm or dispute whether Mr. Cortina had any involvement in the murder. That's correct. That's absolutely correct. And as far as, you know, the... But what do you do with that? You're saying we accept that, but it's not true, or what? I'm not following. No, we accept that they, you know, the police stated that they were only confirming an alibi. But isn't that, in fact, what the record shows? There's nothing to contradict that. Well, I mean, the question is whether or not he was arrested. So, I mean, as far as the confirmation of an alibi... But the police do do that. They do go to ask people to come in to confirm or deny an alibi. Does that mean they've arrested the person? Well, it really depends on the case, you know. And so, in this case, absolutely it doesn't mean he was arrested. But part of that has to do... I mean, all of it actually has to do with the factors. So the... And the factors are well established. I mean, I discussed well over a dozen factors in the opening brief. I'm not going to cover all of that today. But I want to concentrate on just five different factors. So first I want to mention, however, that in Michigan v. Chesternut, the U.S. Supreme Court stated that it's important not just to focus on one factor, but on the course... Okay. So, in addition to that, in the case law it basically establishes two types of arrest. One is by use of force. The other is by show of authority. So in this case we're dealing with show of authority. This is not a use of force case. You won't hear me talking about, you know, any kind of handcuffs or weapons being drawn or anything along those lines. You know, that raises the real problem because once... You at the time want us to believe that there was an arrest by show of authority and the witnesses that were presented on the defendant's behalf present a scenario that is at odds with the testimony of the officers and they talk about handcuffing. They talk about the defendant being dragged from his home. And if we reject and if you tell us those are set aside or rejected or, you know, not part of the findings of the trial judge, I think it makes it awfully difficult for us to yet conclude that a show of authority occurred to lead us to find an arrest. You know, looking at the defense evidence at the pretrial motion hearing, I think there would be no doubt that he was under arrest. But again, that would be under use of force. You know, there they were talking about him being handcuffed, the use of weapons being drawn, he was dragged out of his bed, and I think it would be undisputable that he was under arrest. But again, you know, even under the state's evidence in this case, which we don't dispute because we rely on the lower courts factual findings, there clearly was a show of authority arrest here. And that's supported by numerous Illinois appellate court cases. You know, I want to mention briefly too before getting into the factors that, you know, there was a little bit of confusion in the lower court as to the proper standard. So the lower court actually asked whether or not Mr. Gomez whether or not his will was overboard. So that's actually the test for determining whether somebody's confession is voluntary, and that's not the issue here. The issue here is whether he was under arrest. So the proper test is whether a reasonable person would believe that he or she was free to go. So more specifically, breaking it down in this case, we have an episode at the home, we have an episode at the station. We contend that he was definitely arrested at the home, and even if this court determines that he was not arrested at the home, that he was arrested at the station. So turning to the factors for the home. Just so it's clear, at the station, we're talking about a statement by Mr. Cortino. If the defendant arrived there at 6 a.m. or thereabouts, and Mr. Cortino gives a statement at 6.30 a.m. implicating the defendant, that could be so you're talking about an arrest having occurred prior to that statement being elicited. And I don't recall anything having actually occurred at the station that might have triggered an arrest. The arrest either occurred at the home or it didn't occur at all. Well, we believe that it definitely occurred at the home, but in addition to that there are enough factors at the station, including the Miranda warnings, the fact that supposedly they were just confirming an alibi, but even after they confirmed the alibi at 6 a.m. What about an officer who says, you know what, the guy's not under arrest, but I'm going to give him the Miranda warnings just so that he's informed of how serious this is. He's here as a possible alibi witness for a person we believe may have been involved in a murder and to that extent I want to make sure this guy doesn't lie to me, and so I'm going to give him Miranda warnings. Well, and actually that's somewhat similar to what Detective Turner testified to here. He said it was only as a precautionary measure. However, he also testified that he never informed Mr. Gomez that it was a precautionary measure. What about the room that he was in? It wasn't your typical interrogation room. It was a conference room. It could not be a conference room. Do we look at any of that? I mean, there's no contradiction about some of these things. No one, the fact about going in the side door, that was actually testified that it was the closest door to where they were going to the main conference room. Correct. And actually, addressing your question as well as Justice Garcia's, I mean, the focus here isn't upon the police, though. The focus is upon what a reasonable person, and in this case what a reasonable 18-year-old would believe. But given that If normally defendants are put into a locked room and they're handcuffed to a wall, would the reasonable person think that if they're sitting in a conference room uncuffed and with the door open, that they are like the guy locked in the room? Well, Your Honor, I believe that if the situation was that he was handcuffed to a wall in an interrogation room, you know, we wouldn't be here today. I think it would be very different. I know, but you're saying that we have to look at what a reasonable person would think. And so my question to you is would a reasonable person think they're in the same position as the guy in the room with his arm chained to the wall if they're in a room outside and they're not chained to a wall and they're not locked in any room? What would the reasonable person think? Hey, I'm not that guy. I'm not, you know, I'm not under arrest. Isn't that a reasonable person's thought? Well, again, there are multiple factors here, and a reasonable person would think that if they were woken at 5 a.m. by four detectives, taken in a police car to the station, given Miranda warnings, which are normally only given to people who are either arrested or suspected of a crime. But is the 5 o'clock in the morning tied to some rousting, or is it tied to the time frame that this all took place? When they got Cortina? When Cortina said, I didn't know anything about this murder. I was drinking with Gomez and his cousin. And you can go talk to Gomez and he'll tell you I was drinking with him. Wasn't that really what the time frame is about? They got him at the hospital, they bring him to the station, they bring Mr. Ralston, he says I don't it doesn't look like the guy, and they're at the same time being directed by their sergeant or supervising officer to go get Gomez to see if what Cortina is saying is true. So is that what the 5 o'clock is about, or is it more what you're saying? They went out there to get him at 5 in the morning. Well, they went out there to get him at 5 in the morning, and the reason for that, though, is that you know, we're not looking at this from the police end of things. Now perhaps it was logical for police in their minds, and they thought maybe they were in this the right way, but we really don't know. We don't have any evidence on that. What we do know is that a reasonable person who is 18 years old who was woken up by four detectives, all of whom went into the basement where he slept in a bunk bed with his brother, would believe that yes, he was under arrest. So again, the focus isn't so much on what police did from their perspective. It's not a subjective test. It's an objective one. What if he believes he was under arrest, but he tells the police, I'll go along with you, and had he been asked, he would have lied and said no? I'm sorry, could you restate that again? I think I understood, but I'm not entirely sure. If it's an objective person, and the police have objective statements from the individual that he's going along voluntarily, why should it make any difference that the defendant thinks he's under arrest or thinks he has no choice? If he tells the police, I'm going along with you, the police act on that objective evidence. Well, and that was actually a similar case in Calphe, Texas. In that case, the police actually asked the person, the defendant in that case, would you go along with us? And he said, okay. The U.S. Supreme Court, however, found that that was just acquiescence given the other circumstances. So in this case, we have a similar situation. They tell him to get dressed. On the one hand, they're ordering him. They're telling him exactly what to do. They woke him up in the middle of the night. Again, it was a holiday. But they do ask him, Mr. Gomez, will you go with us? And it's a monosyllabic answer here. He just says yes. He doesn't debate it. But again, they don't ever inform him whether or not, they don't say whether he's under arrest. They don't give him the option of providing his own transportation or answering the questions at his home. They don't say one way or another whether he's under arrest. Instead, they take him in a police car to Area 1 through a police entrance. But they testified, did they not, that when they went to the house, it was only to try to confirm Cortina's alibi? Well, that's correct. They did testify that they were only confirming an alibi. I think all of the, well, I think all of the facts. I mean, at that time, would there be any reason for the police to suspect Gomez of being the perpetrator of the crime? Well, there was not. And so, you know, the state agrees that there was no probable cause. There was no warrant. But Detective Turner actually testified that, well, I must have suspected him for some reason. I don't know why. So we know that there was no probable cause. However, you know, there was some sense that somehow this was related. And basically, it was a fishing expedition. They didn't know what the story was at that point. And so they were just trying to get evidence at this point. Well, that's what policemen do. Well, that's true, but they can't do it without, you know, they should be able to do so without violating the But it's also a little, you know, making light of police investigation to think that they're just out there trying to get evidence from anybody. They're not. Their focus was Cortina. And they wanted to confront Cortina with maybe contrary statements from Gomez to get maybe reveal what actually happened. Correct. And this wasn't random. You know, they did have the supposed alibi from Cortina. Well, what should the police have done? Well, the police could have done a number of things. If they were just confirming an alibi, they could have sent one or two detectives to the house during daytime hours. They could have made a telephone call. They could have actually told them, look, you're not under arrest, but, you know, hey, at your leisure, can you come and talk to us at the station? But should they be holding Cortina for hours so that you're suggesting they come back at 9, 30, 10? Should Cortina be having to have to sit and wait until it's a good time so that the police don't look like they're doing something wrong with Gomez? Is that fair to Cortina? Are they really trying to find out whether he knows something or doesn't know something? Are they supposed to then wait for several hours until it's 10 o'clock in the morning to go out and check out the alibi? Or should they be doing what was right for Cortina, and that is get him in or out? He shouldn't have to sit in the police station and wait for them to decide, well, this isn't the right time to go talk to the alibi. I mean, that doesn't make sense. The police are trying to get something done for Cortina, either get him in or out of this, whatever it is. I mean, isn't that really what their focus should be, that they shouldn't be holding him so they have to act, you know, strike while the iron is hot and also protect Cortina from being detained any longer than he has to be detained? Well, I think as far as Cortina, you know, they did suspect him at this point. And he was also drunk and he had a head injury. And so even the statements they were getting at the time weren't accurate. In fact, Cortina at some point actually confessed to this crime. And the timing simply doesn't work out. I mean, Cortina is excluded from it. Did he confess to being outside or did he confess to war? In fact, he definitely confessed to being outside. As far as whether or not there was more than that, I can't recall off the top of my head. Well, that wasn't a confession. That was just a statement as to where he was when the crime occurred. No, well, I'm sorry. I should rephrase. I mean, he did say that he was actually kind of serving as a lookout at the time. So he did admit some kind of involvement in the crime. But he did have, you know, he had a head injury at the time. But that wasn't when they went out to talk to Gomez. At that point, he had said he didn't know anything about it, that he was drinking all night, and he was drinking with Gomez and some other guy. Isn't that what they were going to check out? That's what they were going to check out, just to elevate that point. That's correct. Okay. So, but given the, again, the reasonable questions. What reason would they, then your position basically is that they went to the house at the wrong time of the day. It's actually a little bit more than that. I mean, well, a considerable amount more than that. It's not just the time of day here, that it's 5 a.m. It's the number of officers, which this Court has considered in people v. Beeman, in people v. Wallace. In each of those cases, there were four or five officers. They considered that an intimidation, like a coercive effect. But you said you weren't contesting the state's position with respect to the actual facts as to what went down at the house. That's correct. We accept the lower court's factual findings. That's correct. And there was a de novo review standard in light of that. But in addition to that, you know, we have the police language. And here he was, Mr. Gomez was told to get dressed. In addition to that, there were things that he didn't, they didn't tell him. So they never told him he was not under arrest. They never told him that he could go back to bed. They never told him that he was free to leave the station once he was at the station. So all of these are factors that are well recognized both in this Court and the U.S. Supreme Court as factors that point to an arrest. Now, in addition to that, once he got to the station, he received Miranda warnings. And, you know, this is established both in this Court's case law, U.S. Supreme Court case law, that Miranda warnings are not given unless a person is either under arrest. Isn't that a factor to consider, not a statement that once the Miranda rights are given, there's an arrest? There's no case that says that. Is that a factor to consider? It's a factor to consider. That's correct. And in fact, and the state brings this up in the brief, that Miranda warnings alone, this does not mean that an arrest occurred. And that's all correct. But the test is, what is the overall course of effect? And here, we have more factors than you'll find in almost any other case in this state of Illinois. In addition to those Miranda warnings, though, once they confirm the alibi, again, he wasn't allowed to leave after that. So given all these factors, Mr. Gomez was certainly under arrest. A reasonable person at the home wouldn't have felt free to just ignore police and go back to sleep. And that's the test for the home. A reasonable person at the station wouldn't have felt free to ignore police requests and just leave the station. So turning briefly to attenuation, though, there are four factors. We concede that Miranda warnings occurred in this case. Attenuation only arises, though, if we find an illegal arrest, right? That's correct, Your Honor. That's correct. Maybe we should hold off on that. Is it okay if I address it just briefly, just assuming that this court reaches that decision? Sure. So assuming that, as far as Miranda is concerned, we concede that it occurred here. However, in Brown v. Illinois, the U.S. Supreme Court established that that alone is not sufficient for attenuation. In addition, in this case, Miranda warnings were given before probable cause. But we would remand if there was an attenuation question, wouldn't we? I mean, that would be the right thing to do? Well, Your Honor, actually, in our briefs we said that it wasn't necessary for remand. Upon further consideration, though, we do believe that a remand would be appropriate for an attenuation hearing as well. The reason that would be appropriate is simply that the lower court didn't get to address these attenuation factors. So if there are no further questions, in conclusion, Mr. Gomez was definitely arrested, if not at his home, then at the station. The State has the burden of proving attenuation. They failed to do that. In the light of that, we ask that this Court either reverse Mr. Gomez's conviction and remand for a new trial or remand for an attenuation hearing. Thank you. Thank you. I'm going to have to apologize. Thank you. Have a nice weekend. Ms. State's Attorney. Yes, Your Honor. Your name again? Jessica Ball. What was that? Jessica Ball. B-A-L-L. Have you been before us before? Yes, sir. I'm getting old. I should have remembered. If I may. The trial court here just initially did not use the wrong standard. Perhaps it wasn't artfully stated, but it was not the wrong standard. Even if it was, this Court could affirm for any reason. What did the language of the trial judge, what did he say? He said that the defendant voluntarily accompanied the police to the station. Nothing wrong about that, which is what he did. The question here is, based on the detective's testimony, whether or not the defendant voluntarily accompanied the police to the station and stayed there until 630 voluntarily. And the answer clearly is that he did. The defendant says the facts are undisputed. They are. What is undisputed is that the detectives treated the defendant like an alibi witness. They asked the defendant if he knew Cortina and if he'd go to the station to talk about Cortina using him as an alibi. They did not yell at him. They did not shout at him. They did not display their weapons. They weren't hostile. It was a completely amicable situation at the defendant's house, so much so that they even answered the defendant's sister's questions about the educational requirements for becoming a police officer. He was not handcuffed. He was not searched. The police did not physically touch him. The defendant walked himself to the car. Do they really need handcuffs when there's four police officers entering a home at 5 o'clock in the morning and they're dealing with an 18-year-old? I mean, do the police need to have handcuffs to make somebody think that they're under arrest? Well, they do need them when they're arresting somebody, so yes, it's a factor to consider whether or not they're handcuffed. And if you're talking about actually arresting somebody... I don't think this case stands or falls on whether or not they used handcuffs. I think it's a factor to consider. Absolutely. In this case, they weren't used. I mean, this is more of a... the counsel's arguing a show of force than anything else. And there wasn't... One versus four is different. Actually, it wasn't one versus four. There were four detectives there. It wasn't a threatening show. The defendant was at his home with his sister, his mother, his brother. The testimony of the sister and the mother certainly conflicts with what the police said. However, the defense even concedes the state's testimony at this point. When they got to the station, the defendant went to a conference room, not an interview room. It was open. It was unlocked. The defendant had access to the bathroom on his own down the hall and he used it. He was told he chose not to call. And he was only at the station for an hour and a half before probable cause developed. These detectives, by looking at these facts, they were not on a fishing expedition to find probable cause for this defendant's arrest. They thought he was an alibi witness and they treated him like one. They weren't looking to get a confession from the defendant, but just to verify Cortina's statement. And you know that because they didn't even ask him anything about the crime. They only asked about Cortina's whereabouts. If the defendant was uncomfortable, scared, or wanted to go see his mom, he chose not to. The most telling fact here is that they did not treat him like a suspect until Cortina placed him at the scene. Then they treated him in a starkly different manner. Like they treat suspects. They put him in a locked interview room and they didn't talk to him for three hours. The detective's actions here were perfectly proper. They did what was minimally necessary to properly investigate a crime. The defendant speaks about these 19 indicia of arrest. The law is clear. There are many Mendenhall factors. The factors you look at to see whether or not a defendant's under arrest. None of those factors exist in this case, so the defendant makes up these 19 on his own. However, take them apart, put them together, the 19 points do not support a finding that he was under arrest. Nothing the detectives did ran afoul of the Fourth Amendment. He talks again about the four detectives being present, but it wasn't a threatening presence. He said that they went to the house at 5 in the morning and woke him up. It was early, but as Justice McBride pointed out, they were in the midst of a murder investigation. That was the process that they were running the course of their investigation. They didn't surround the house. They didn't have a SWAT team there. And they didn't need to confirm his alibi at his house. The lead detective wasn't there. The most prudent thing to do was to bring him back to the station and hash it all out. There was nothing wrong with the way that they conducted the investigation. The defendant complains that he was not told that he could refuse to go to the station. But the law doesn't require that. Every citizen has a duty to cooperate. He argues that he only gave a monosyllabic response. But really the officer's questions didn't require any more than that. And it's not the detective's fault if the defendant wasn't chatting. The fact that he wasn't given an opportunity to drive himself to the station really is inconsequential. The police can drive a person to the station for a consensual interview. Again, advised of his Miranda rights. Again, as Justice McBride pointed out, it's a factor. It's one factor. And it doesn't turn the encounter into a seizure. The defendant claims, or I'm sorry, argues that the detective said he believed the defendant was under arrest. But those thoughts were conveyed to the defendant. So it doesn't matter. If you look at all of these 19 points that he points out, collectively, individually, they don't equate with an arrest. The detectives ran a proper investigation. They didn't run afoul of the defendant's Fourth Amendment rights in any way. The trial court's findings that the defendant voluntarily went to the station and remained there until 630 when probable cause developed was not against the manifest weight of the evidence. If there are no questions, we would stand and rest on our brief. And we ask you to confirm, I'm sorry, affirm his sentences and convictions. Thank you. Counsel, you have the final word. It's your burden. I have a question in response to something that the assistant state attorney said. Is it an accurate reflection of the record that when he was in the station, he was told he could use the bathroom? He was told where it was, and he actually did go to use the facilities in the station? That's correct, Your Honor. Would that be something that a reasonable person would think would suggest to them they were free to go, or would it be? Well, Your Honor, as far as using the restroom, the state mentions also that he was able to smoke a cigarette and get a drink and all these kind of factors. First of all, they're not factors supported by Illinois law or a Supreme Court case law. They're not factors at all. In addition to that, if you look at a case like People v. Nicholas, people who are under arrest were allowed to do this. Do those things, though, suggest freedom of movement, freedom to leave? No, I don't believe so, Your Honor. It suggests that he was allowed to do basic things that even people under arrest were allowed to do. I don't think it's realistic to say that individuals in custody that are actually under arrest are allowed to go from the room that's locked on their own and use a washroom in the police facility. I don't think anybody would agree with your statement. It's unclear whether or not he was going on his own or if he was accompanied by police. They just say that he used the restroom, he smoked a cigarette. So it's not clear. It's not clear from the record. In addition to that, I want to address just a couple points. The state mentions these 19 factors, and there are 19 factors in the opening brief as well as the reply brief. Each, and they said that these are made up. Each one of the factors has case law supporting everyone. So it's not something that's made up. As far as factors, though, the state mentions that he had free reign of the police station in the brief. It's unclear what this free reign means. They don't really establish what that is. In addition, there isn't any case law that says this free reign actually means that he's not under arrest. In addition, they say that he was made comfortable. Again, they don't say what made comfortable means or why that means he's under arrest. As far as the handcuffs, again, you know, this is not a case about the use of force. This is a case about the show of authority. And, in fact, this court has a number of cases where handcuffs were not used, where Miranda warnings were given, and the person was considered to be under arrest, including people V. Vega, people V. Dowdell, people V. Ali, people V. Demon, people V. Towns, people V. McGee. So this comes up time and time again. So the fact that handcuffs were not used is certainly not dispositive in this case. Briefly, the state mentioned manifest weight. That's not the standard here. Again, this is de novo. And, finally, Your Honors. Well, it's de novo in the sense that we review whether there was an arrest, whether that took place and when. It's ultimately a question of law. That's correct. But under Ornelas, we are giving some deference to factual findings that were made. Correct. So there are some factual findings that are, you know, I mean, at issue. Well, we do give deference to the factual findings. Okay. And, again, you know, in light of, you know, the state's brief actually takes these factors one by one, and actually only six or seven of the factors out of 19, takes them one by one and tries to take them down and say, well, that by itself is not enough. Well, that's not the test. It's the overall coercive effect. And looking at the full picture, he was definitely arrested. And then, finally, the state mentioned that they didn't surround the house. That's actually not true. When they first arrived at the Gomez home, two detectives went to the front door. I'm sorry, it's actually the side door. The front door is kind of on the side of the building. Two detectives went to the back door. They were the only two entrances to the house. So they did actually surround the house. Your Honors, if there are no further questions. Thank you. Counsel, thank you all. The case will be taken under advisement.